RTP:MEC
F. # 2016R00405

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                           Docket No. 16 CR 204 (ILG)

LYDIA HILLS,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


GOVERNMENT'S SENTENCING MEMORANDUM


RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Martin E. Coffey
Assistant U.S. Attorney
(Of Counsel)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                                      Docket No. 16-CR-204 (ILG)

LYDIA HILLS,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

PRELIMINARY STATEMENT

        The Government respectfully submits this Memorandum of Law in opposition to the defendant LYDIA HILLS' sentencing memorandum.  On March 20, 2019, HILLS, an attorney and a real estate broker, was convicted, after a jury trial, of conspiracy to obstruct, influence and impede an official proceeding, and attempt to do so.  Specifically, HILLS conspired to obstruct the execution and enforcement of a Judgment of Conviction for restitution and an Order of Forfeiture, entered on July 27, 2010, in United States v. Faith Esimai et al., (Docket No. 09 Cr 00978 (DLC)) in the United States District Court for the Southern District of New York, in violation of Title 18, United States Code, Section 1512(k).  The defendant was also convicted of a substantive count of obstruction of official proceeding in violation of Title 18, United States Code, Section 1512(c)(2).

        HILLS raises several objections to the Presentence Report ("PSR"), including the Probation Department's Sentencing Guidelines calculations.  Furthermore, pursuant to Section 5K2.0 of the Guidelines, HILLS moves for a downward departure and a sentence of probation on the grounds that her conduct underlying her conviction was aberrant behavior that was far removed from her

2

professional and personal life.  She also moves for a non-Guidelines sentence pursuant to United States v. Jones, 460 F.3d 191 (2nd Cir. 2006).

        The Government disagrees.  HILLS' challenges to the PSR lack merit and her Guidelines were correctly calculated.  The government recognizes that the defendant has three small children and is expecting another child in early 2020 and the Court should take these circumstances into account at sentencing.  However, because the defendant is an attorney who violated her oath and engaged in a serious offense, punishment and deterrence are required.   The Court, therefore, should impose a sentence within the Guidelines range.  The Court should consider delaying the start of a term of incarceration until after the birth of the defendant's child.

Statement of Facts

A.      Michael Ashley

        At trial, the government's case relied on the testimony of Michael Ashley,[1] a

cooperating defendant, and his consensual recordings of the defendant.  While cooperating,

Ashley operated a business in which he bought, sold and invested in real estate.  In March and

April 2016, Ashley made several consensual recordings of meetings and telephone calls with

HILLS and Faith Esimai, all of which, except for one, were under the supervision of agents from

the Federal Bureau of Investigation ("FBI").  In these communications, HILLS and Ashley

discussed the purchase and sale of Esimai's real properties through "short sales."   A real

estate/mortgage "short sale" is a pre-foreclosure sale that occurs when a property is sold for less

than the balance remaining on the homeowner's mortgage.  If the bank or the mortgage company

holding the mortgage agrees to a "short sale," a homeowner can sell his or her home and pay off

all or a portion of the mortgage with the proceeds.  (T. 145-165, 213-228 )[2]

---

        [1] In 1993, Ashley was convicted of wire fraud in this District.  At that time, Ashley
cooperated with the government and was sentenced to two months' home detention, five years'
probation and ordered to pay $30,000 in restitution.  In August 2011, again pursuant to a
cooperation agreement, Ashley pled guilty in this District to a $49 million bank fraud in which
fraudulent federally-insured loans were issued.  In July 2019, after his cooperation in a number
of matters, Ashley was sentenced to thirty-six (36) months' imprisonment and ordered to pay
approximately $49 million in restitution to a government agency that insured the fraudulent
loans.

        [2] "T" refers to the trial transcript.  Prior to trial, after medical examinations and a hearing,
Esimai was found by the Court not competent to proceed, because she suffered from dementia.
On the government's motion, the Court dismissed the case against Esimai.

4

B.       Esimai's Criminal Conviction

On July 27, 2010, Esimai was convicted, together with others, in the United States District Court for the Southern District of New York of conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 1349 (the "SDNY Conviction").  Esimai was sentenced to seventy (70) months' imprisonment and ordered to pay $4,952,831.73 in restitution.  The sentencing court also entered an Order of Forfeiture in the form of a money judgment in the amount of $13,517,486.   (T. 240).  Based upon the Judgment and the Forfeiture Order issued in the SDNY Conviction, the U.S. Attorney's Office for the Southern District of New York had filed liens against four properties owned by Esimai  (the "Four Properties") (T. 176-188).

C.       Esimai's Real Properties

Esimai owned eleven (11) real properties.  During several March 2016 consensually recorded conversations with the Esimai and HILLS, Ashley agreed to purchase the Four Properties and to arrange for "short sales" with the financial institutions holding the mortgages on the Four Properties.

D.       The Evidence against HILLS

(i)   The March 1, 2016 Meeting

On March 1, 2016, Ashley met with HILLS at her law office and on his own initiative secretly recorded this meeting.  They discussed Ashley's purchase of properties owned by Esimai.  Ashley proposed to purchase the Four Properties by arranging for "short sales" with the banks and mortgage companies holding the mortgages.  For her part, HILLS agreed to arrange with the U.S. Attorney's Office to release the government's liens on Esimai's properties. HILLS made a point of telling Ashley that she was a "licensed real estate broker" and

5

"prefer[red] to be the broker on this thing," receiving "six percent" as her broker's fee.  (T 162-172).

HILLS told Ashley that Esimai had recently completed five (5) years in prison for mortgage fraud.  According to HILLS, Esimai wanted to sell some of her properties, but she did not want to surrender, as required under the Judgment and Order of Forfeiture, the proceeds from the sales to pay the restitution and the forfeiture sum that she owed.  The following transcript is an excerpt from the March 1st meeting:

HILLS ("LH"):          Five years in federal prison.

Ashley ("MA"):        Wow. Sorry to hear that.

LH:                            For real estate fraud.

MA:                           Okay.

LH:                            Mortgage fraud.

MA:                           Okay.

LH:                            I think what she was doing was helping people to qualify for mortgages
                               by changing numbers [UI]. I don't know I was younger back then.

MA:                           Yeah.

LH:                            I didn't know what was going on.

MA:                           Right.

LH:                            Um I wasn't really involved and I don't even know anything about it. All
                               I know is that she just came out of jail this past year, 2015. And she's
                               been ordered –

MA:                           These are houses from - from before she went to jail?

LH:                            Yes.

MA:                           Ah, I see.

6

LH:         She owned all these houses. But she had - she was involved in - I think she was a mortgage bank or broker or something like that. I don't know.

MA:         Okay.

LH:         But there were a bunch of properties that she was involved in: sales, you know purchases, all sorts of stuff.

MA:         Okay.

LH:         Her and five other people they were working together. They were all sentenced to prison, federal prison. And as a result, there is this five million dollar lien.

MA:         [Chuckles]

LH:         That she and these five individuals have to pay back as restitution.

MA:         Believe it or not it's not uncommon. You see that a lot in Brooklyn, in Queens.

LH:         Mhm.

MA:         You see that a lot.

LH:         So the thing is that she cannot personally benefit from any sale.

MA:         Okay. At all?

LH:         Because if it does, it has to go to the government. Restitution.

MA:         Right. I gotcha, I gotcha.

LH:         So if we can do these sales and you know. I know she doesn't want to sell all of them; she wants to sell some of them, wants to keep some and [UI]

MA:         Why wouldn't she want to sell all of them? It'd be better just to get rid of them, no?

LH:         She needs to live. She needs rental income.

MA:         Oh she's getting rental income from them? Okay gotcha.

LH:         Yeah, some of them.

MA:         Okay.

7

LH:             So she needs to be able to survive and take care of herself for the rest of her life.

MA:             Right.

LH:             And she's doing that through rental income.

MA:             I gotcha.

LH:             So um…

MA:             So she's picked a certain number of them that she wants to sell?

LH:             Yes.

MA:             Okay. We'd love that. We'd love to buy them all. How many?

LH:             I would say at least four.

MA:             Uh huh.

LH:             I would say at least four. Um I told you about one of them 7217 Burchell Avenue which is in Far Rockaway and Arverne, New York, that's one for sure.

                            *                    *                    *

MA:             So that's why we're here-

LH:             And um… you know if there's anything that can be derived from these properties on the side for her -

MA:             Okay.

LH:             I'd really appreciate that -

MA:             Okay. How do you propose that we [UI] - I don't know the players -

LH:             Yeah…

MA:             I don't know. You have to – I don't know. I mean I'm sure it's possible you just have to tell me how -

LH:             I don't know how.

8

MA:                      [Laughs]

LH:                      You guys are the professionals. You do this all the time.

MA:                      [Laughs] Yeah, yeah. No, no I understand, yeah, yeah.

LH:                      She's an old lady. She can't get anything on the books.

MA:                      So it's got to be off the books. So it has to be cash you think or…?

LH:                      Possibly. She can't get anything on the books. I've been working my butt off. I have to get paid so that's why I think its best that I get paid as a broker -

MA:                      Okay.

LH:                      Cause that's the [UI]. But I'm not about to; necessarily give her a share of my broker's fee.

MA:                      Right.

LH:                      I'm not trying to do that because, I've earned the money that I'm -

MA:                      I'm with you. I understand. You want to get paid separately.

LH:                      No, no. I've been managing the properties; you know I've been -

MA:                      Absolutely.

LH:                      I've been changing locks on doors and responding to tenants' needs. And all kind of stuff -

MA:                      And she's collecting the rent to live on? Okay. So you'll be the broker, no problem.

LH:                      Mhm.

MA:                      Do you think the only way to do it though is to make sure everybody's protected?  Do you think cash is the only way to really do it?

LH:                      I don't have any other way though because (UI).  Everything she gets has to be disclosed to the government.

MA:                      Right.

LH:                      You know what I mean?  I mean . . .

9

| | |
|---|---|
| MA: | I just want to know because I have to be able to prepare for myself, to be able to- I need to know the number and I need to know- |

(ii)  <u>The March 8, 2016 Meeting</u>

On March 8, 2016, Ashley met with HILLS and Esimai at Esimai's residence in Queens, New York to discuss Ashley's purchase of the Four Properties.  The FBI recorded the meeting.  At the outset of the meeting, HILLS warned Ashley that "[w]e can't talk on the phone."  They then discussed "how we should do it," namely how to structure the real estate transactions so as to conceal the proceeds of the sale from the government. (T. 176-184).

| | |
|---|---|
| LH: | First of all. We cannot make any large deposits into your bank account. You know that. So what I propose is: I'll be giving it to um… [UI] Let's say $25,000 ok?  Let's just say that [UI] Every month I'll be putting in $1,000 so it looks like maybe I'm paying rent or something like that. But you can't… |
| MA: | Is that what-- is that what the number [UI] like $25,000 property? |
| LH: | Possibly. |
| MA: | Yeah? |
| LH: | What is—What do you think about that? |
| MA: | So it can depend on the bank. So if you--you know 'cause you buy a lot of houses obviously so you know I have to negotiate with the bank to get the bank down as cheap as I possibly can. |
| Faith Esimai (FE): | Yeah, I'm talking to them. They're willing to work. |
| MA: | Yeah? |
| FE: | They're willing to work. |
| MA: | So, the cheaper I get them the more I can give to you, you know? It's just a matter of dollars and cents. It's a matter of – that's all I just want to get—look I just want to make a living.  I don't—I'm not greedy. It could be a fair number, you know what I mean? |
| FE: | Well I'm an old lady [laughing] I'm not buying anymore. |

10

MA:                    Mhm. Ok.

FE:                    So I need to put something away.

MA:                    Ok

FE:                    Otherwise—

MA:                    I understand.

LH:                    That's—that's something we're going to work on doing.

FE:                    Yeah.

LH:                    Another option—another option is if she has a bank account in Nigeria---

FE:                    In Nigeria.

LH:                    I can always put the money in that account.

FE:                    …why don't I put it in my childrens' account.

LH:                    That's another option too but I'm—I'm very cautious and very afraid. I don't want any…

FE:                    Them to get into trouble.

LH:                    Yeah, I don't want any paper trail of large transactions.

FE:                    Into the accounts.

LH:                    Right. 'Cause like – they're going to see—we have to talk to the attorney general's office to release the lien.

MA:                    Yeah, we're going to have to – one thing is I looked into it because I—we did a few of these before.

LH:                    Mhm

MA:                    So what we do is, we go to them and show them first we get the short sale approved with the bank and we show them that there's no equity. Right? Because it's a short sale. Then we give them a letter signed by you, uh saying that uh you're selling the property and asking them to release the lien and you're not getting any money from it. Then they release the lien. Once they release the lien – once they give me the—the lien release, they're still

going to hold you responsible though for you know whatever judgment it is. I don't know what the—I don't know—I don't even know the story really but they would still hold you responsible but the lien will be released from the property so that the property will be able to…

FE:      That's okay. That's okay.

LH:      And that's—and that's what I'm saying. So because we're—you're representing to the government that you're not getting any money you have to be careful that you—that there's no evidence that you're getting money. Do you see what I'm saying?

FE:      I have no problem [laughs].

MA:      Okay, so how do you suggest the best way to do this? You tell me, because I don't know your situation.

LH:      I think that we can figure that out.

MA:      I just know that I can't—I don't want to have any trouble myself.

                         *              *              *

MA:      Well I know, I understand. No, no, no I understand. I understand but we have to have the way like in other words, maybe it's a good idea if it goes—if –if she has a bank account like you say in say Nigeria, nobody can track that, right? I assume?

LH:      Mhm. Yeah. So when I go to Nigeria I can just deposit the money there. You know what I'm saying?

MA:      I mean, I don't want to have any…

LH:      Trail.

MA:      Trai—I mean I want to buy the houses but I also can't have any yeah, I don't want an arrest [laughs].

FE:      [UI] If you're buying cash then it's not a problem.

MA:      Well I am buying cash.

FE:      Okay, then it's not a problem.

| | |
|---|---|
| MA: | So—yeah but when you're buying cash you know—you don't pay all cash. I mean you want your part in cash. |
| FE: | Mhm. |
| MA: | Ah. |
| LH: | Is that possible? |
| MA: | [Sighs] I mean… |
| FE: | Because they don't—they won't know you gave me that cash, they'll—they'll—they'll [UI] |
| LH: | That's true. |
| MA: | If that's what it takes, then— |
| FE: | Yeah because this… |
| LH: | But—but—you Auntie you have to be very careful with that… |
| FE: | I— |
| MA: | What're you going to do with it? It's a lot of money. |
| FE: | [UI] Because, see my [UI] |
| LH: | You know what I'm going to do is I'm going to buy you a safe. I'm going to buy you a safe. |
| FE: | Mhm. |
| LH: | So any money that you have [UI]- |
| FE: | Because what I told her, I didn't believe in leaving money in the bank. |
| MA: | Uh huh. |
| FE: | So every dime I had I put it in buying these houses |
| [Phone rings] | |
| CHS-1: | Uh huh. So all the money is in your houses. |
| FE: | In the houses. See if I lose them... |

LH:        She put a lot—she put a lot—she put a lot of money into these houses.

MA:        I see, I see.

LH:        Her own money.

MA:        I see.

LH:        That's the problem. And that's what is that connection (UI) it's easier to get rid of them.

MA:        I understand.

LH:        It's not so easy to just get rid of them because she actually put money into it.

*        *        *

MA:        Yeah, okay so once I buy these houses the thing is this: I don't mind—I'll go along with everything but I want to make sure you're able to sign because I—I want—I need to own the proper—I want to make sure once I pay all the money that I own the properties.

FE:        Of course I will sign.

MA:        Okay.

LH:        Yes, she will sign absolutely.

MA:        Okay.

LH:        Whenever there's a signing, I'll be there. Her daughter Dee will be there as well, even though you don't Dee there, but Dee is the power of attorney. She's her blood daughter. She will be present for any signings.

MA:        Okay.

LH:        Okay?

MA:        Okay.

LH:        Myself and Dee will be present for all signings.

MA:                Okay, I just wanna make sure that you can—tran—transfer the properties. That's all.

LH:                 She can, she can.

MA:                Okay.

LH:                 She can.

*                *                *

MA:                How much money do you want in—in cash from me?

FE:                 $25,000

MA:                25?

FE:                 Yeah.

MA:                You said 25?  Okay so 25 for this one, and on Burchell?  Because I have to put in the numbers and then negotiate with the bank so I know. How much on Burchell?

FE:                 Burchell is a one or two family house?

MA:                It's a two family.

FE:                 But this is [UI] area.

MA:                Yeah.

FE:                 So you give me a little more on that.

MA:                Okay,  I don't mind giving you a little more on this one because you're right, it's an up and coming area but I have to see what I'm gonna be able to get it--

FE:                 Mhm.

MA:                --for from the bank. Do you have any idea—like what's your bottom line on it?

FE:                 The Burchell one?

MA:                Yeah.

LH:                What's the minimum that you would take?

FE:                (UI)

MA:               Yeah.

FE:                You can't get me 25?

MA:               But I want it.

FE:                You can't get me 25 too?

MA:               25 uh both of them?

FE:                Uh huh.

MA:               On each one? So 50 all together?

FE:                Uh huh

MA:               Okay, just remember, just remember it has to be ca—if—if it's gonna be in cash—

FE:                Mhm?

MA:               It costs me money for taxes because I have to pay you cash I can't report it. It's not—I'm not saying that it's too much, I'm saying it's ok but just remember, you know, that's probably going to be the maximum that I'm gonna be able to do, is that amount. I'm not going to be able to do more than that.

FE:                You just said buy those two.

LH:                For those two.

MA:               For those two. Yeah, each one.

LH:                Mhm.

MA:               Right so it'd be 50 altogether.

FE:                Mhm.

LH:                What about for the third one, the shell?

FE:                Yes, what about that?

MA:             I mean, I—I'm okay--

[Laughing]

MA:             What's that? What'd she say?

LH:             You've run out of money.

MA:             No, I'm not. I didn't run out of money, this is what I do for a living. No,
                believe me—it'll be 10 or 12 in the month so…

                            *            *            *

MA:             This is the third one.

FE:             The third one? That's the one you said—I love that house.

LH:             No, we—

MA:             It's wrecked.

LH:             We'll make the decision aft--

MA:             There a roof off it.

LH:             We'll make a decision after you visit. How about that? I don't want to force
                you into anything. So let's—let me take you there. I want you to see it for
                yourself.

FE:             Okay.

MA:             So as long as we know the numbers I'm good. And then as long as we—
                you can—I need to give that affidavit to the attorney general. You realize
                we have to give that affidavit to the attorney general?

LH:             Mhm, mhm.

FE:             So there's no rush. What if—if he picked out four he wants—as long as I
                have hundred money coming from here, installments--

LH:             Yeah, yeah you'll have your—you'll have your properties that you're
                keeping and then you'll have the cash that you receive on the side.

FE:             Mhm. So if he can set us up 100 for me.

17

LH:     For the four.

MA:     100,000 for four?

FE:     For four.

MA:     Ok, fine.

LH:     So it's basically 25 each.

MA:     Fine. That's fine. Alright, fine. That's good for me because I can get four in one shot.

FE:     Because it's really the going rate is no good. And what are his plans?

LH:     Well we have to talk. We have to talk because I'm—I'm very much concerned for you. Please don't talk about this on the phone to anybody.

MA:     Yeah, no listen. Don't talk on the phone to anybody because I can't—I can't have a problem.

FE:     I don't.

LH:     Only talk when they're—when he comes here then talk to her face to face.

FE:     [UI] talking to her about money on the phone.

LH:     I'm just saying, please.

FE:     I won't. Of course I won't. [UI]

CI:     Okay.

FE:     (UI)

LH:     No, no. I'm just saying 'cause sometimes we forget, and we're just think that everything is —but no

FE:     No, no, no. We don't discuss money at all on the phone, okay?

MA:     Okay, will you be there—

FE:     We don't even discuss these houses. 'Cause my children are not interested in houses.

LH:     Mhm.

MA:           Okay.

FE:           Okay? [UI] Think it over uh but they didn't, anyone's not complaining [UI]

MA:           Okay.

FE:           Yeah.

MA:           Okay. So fine, I'll hold up my end of the bargain but it'll be one house at a time so as we—you know if we could close them all at the same time, I will.

LH:           Perfect.

CI:           Okay? And I'll just come with the whole—you know—

LH:           Mhm

MA:           Suitcase full of cash.

[Laughing]

MA:           If—if not, it'll be each one, one by one.

FE:           Make it—make it one by one.

MA:           Okay.

FE:           So we have confirmation that there are no counterfeits.

LH:           When—when Dee comes—

FE:           Mhm.

LH:           I would like you to sit down and talk with her too. You guys can figure out how you're going to handle that money, whether it's putting it in a safe—

FE:           Why do we have you?

LH:           I know but—I'm—that's your daughter, you know? Like I—I want to make sure that she's on the same page with you as well.

FE:           My children are not--

LH:           She comes to your house all the time. Like—

19

FE:          She doesn't.

LH:          She's your protector.

FE:          My children are not business minded.

LH:          I know but still…still I think it's important, I think it's important.

FE:          They are not business minded so we [UI]

LH:          I'm going to tell you the reason why I'm saying that.

FE:          Mhm.

LH:          Do you want me to tell you why I'm saying that?

FE:          Okay

                          *                *                *

MA:          Yeah, no I know. I know, but you know a lot of people—a lot of investors are out there but at the end of the day, you know, we have to be able to be— we—we have to be careful cuz I don't—I—I can't afford to have any problems and I—I—

LH:          Neither can I.

MA:          Right.

LH:          I'd lose my license to practice law.

MA:          Right so, this has to be like—here. Nobody else. Ok.

FE:          [UI] Anymore.

MA:          Okay. Okay. Alright. I'm gonna get—I'm gonna look into the AG's office.

LH:          Okay.

MA:          To find out what they need.
LH:          Mhm.

MA:          And I'll work with you to get the affidavit.

LH:         Okay.

MA:         That we'll have to get from them to release and then I'll work with the banks
            on these four properties.

FE:         But what—why would we tell them we want to release?

MA:         Uh—we could tell—well what you're going to tell them actually is you're
            gonna have to tell them.

LH:         Yeah, you—you want me to—so you want me to—

FE:         But are we talking to them and the banks or

LH:         No, not the bank. The attorney general's office.

FE:         Oh.

LH:         The people who put the lien on the house.

FE:         Ah. 'Cause I thought that [UI] the banks are very [UI]

LH:         Yeah, yeah

MA:         Yeah.

LH:         It's the government 'cause the government who's pu—putting the lien on
            the house, meaning even if you sell it to him, that lien will still be there.

MA:         I'll hold—I'll hold—right then I'll be stuck with it.

LH:         Right. So what we're doing is calling them and saying can you please
            release this lien because she's not gonna get any money. Allow him to buy
            it because she's not getting any money. So we have to put that in writing,
            sign it, and send it to them. That's what he's saying.

FE:         Oh.

MA:         You understand? Otherwise, I won't be able to buy the house.

LH:         It's sort of like a tax lien. A tax lien won't go away unless it's paid or unless
            it's forgiven. And in this situation, we're asking them to forgive that lien
            because you're not receiving money.

                        *                    *                    *

| | |
|---|---|
| MA: | And I'll get the contracts to you ASAP like literally tomorrow. You're gonna have them in your email. |
| LH: | Okay, no problem. No problem. |
| MA: | Okay? And then the affidavit—we'll discuss what has to be done to the affidavit to send to the AG and negotiate, I'll find out. |
| LH: | Mhm. |
| MA: | I guess you'll—you'll prepare and have her sign it. |
| LH: | Yes. |
| MA: | We—we'd start to negotiate with them and we're finished. |
| LH: | Not a problem. |
| FE: | But that's—make sure no check. |
| LH: | No check to you. |
| FE: | To me. |
| MA: | Right—that's—I understand, no check. No believe me, no check. I can't—I'm not giving you a check. |
| [Laughing] | |
| MA: | I'm not giving you a check. I like you, but I'm not giving you a check. |
| [Laughing] | |
| MA: | I wish I could give you a check. If you would let me, I'd give you a check but I can't. |
| LH: | Right so—so--so |
| FE: | So who will—who will count the money and make sure it's not counterfeit? |
| LH: | I'm going to be here. |
| MA: | I'll give it to you and I'll wait you count it and do whatever you want. |
| LH: | I have a counterfeit pen. I have a counterfeit pen. |
| [Laughing] | |

22

MA:          Okay

LH:          No, no I do. Just—you know, just um Friday I met with a client—one of my—my—art—my music clients and they brought $45,000 so I had to buy this. It's a money marker.

FE:          So if it's counterfeit it whitens?

LH:          It—it gets brown. Dark brown if it's counterfeit. This is a counterfeit pen.

MA:          Wow.

FE:          Oh yeah? That's interesting.

LH:          Yeah. I just bought it. So you don't to worry about that.

MA:          Good, I'll sit here while you count it. Don't worry. I'll sit here while you count it and it'll be fine.

LH:          So what I was gonna—I was gonna say something I'm just forgetting it. So I'm the broker on the deal. So I'm gonna be paid a brokers fee. So the money that you're—

MA:          It's not coming out of---it's not coming out of your money.

LH:          It's not coming out of your money. So you don't have to pay me a dime. My brokers fee, just so you know, will coming from the sale price.

MA:          From the sale price.

LH:          So you don't have to give me one cent.

MA:          The bank winds up paying it. When we negotiate with the bank, they pay it. Okay?

FE:          Okay. So then—

MA:          So we have an agreement?

LH:          [UI]

MA:          Four houses, 100,000.

FE:          You rather take the money as a broker than as a lawyer?

23

LH:             Than as a lawyer. Exactly. That's why I'm calling my friend to do the closing. If I, look, if I do the closing as a lawyer I'm gonna get $1,500.

FE:             More than a broker?

MA:             No.

LH:             No the broker makes more.

MA:             Yeah, the broker's gonna be, you know…

FE:             Oh $1,500 [UI]

MA:             Yeah, yeah, yeah. A broker's gonna be 12 15,000 a shot.

LH:             It's like 6% of the sale price.

FE:             [UI] bought all these houses.

MA:             Mhm.

FE:             But now…

LH:             Mhm.

MA:             I understand.
LH:             So that's the thing. So that's why I want—I don't wanna be the lawyer on the deal cuz you know I've been working hard from the beginning.

FE:             I hear you.

LH:             With no pay.

FE:             I hear you.

LH:             So this will be my pay.

FE:             Ok, that's great.

(iii)   <u>HILLS' Fraudulent March 15, 2016 Letter</u>

On March 15, 2016, HILLS sent the following letter to the U.S. Attorney's

Office, for the Southern District of New York:

Re:     7217 Burchell Avenue, Arverne, New York 11692

To Whom It May Concern:

This office represents Faith Divine Esimai as the broker for the sale of
her property referenced above.  The property is currently in foreclosure
and an auction date has been scheduled for April 8, 2016.  Due to the amounts
required to be paid by Ms. Esimai for restitution, their (sic) is a hefty lien on this
property.

Ms. Esimai is receiving no benefit, financial or otherwise, from the short
sale of this property.  A contract has been made between Ms. Esimai and a
potential buyer.  As such we are seeking to have the lien lifted in order to
consummate the transaction.  On behalf of Ms. Esimai, I am requesting any
information or instructions on how this lien may be released from the property.
Ms. Esimai will provide an affidavit attesting to the fact that she will not receive any
financial benefit from this short sale.  Any additional documentation or information
shall be provided upon request.

Your prompt attention to this matter is very much appreciated.  Please
feel free to contact me directly at 646-247-0588 to discuss this matter.

(iv)   <u>The April 6, 2016 Closing for 72-17 Burchell Avenue</u>

On April 6, 2016, HILLS, Ashley and Esimai held the closing on Ashley's

purchase of 72-17 Burchell Avenue from Esimai.   At the end of the closing, HILLS and Esimai

were arrested.  At the time of her arrest HILLS possessed, the $33,100 in cash that Ashley had

given to her as her broker's fee along with $25,000 that was supposed to be the purchase price

for the property.

25

At the closing, HILLS voiced her concern about jeopardizing her law license because of her fraudulent conduct.

| | |
|---|---|
| LH: | I think it's best if we [UI] hand the money to me. |
| MA: | Okay. |
| LH: | Because I'm a little concerned of um – |
| MA: | Okay. |
| LH: | Her memory is really bad. And I don't want her to talk about this on the phone. I think we should just hand the money to her daughters. |
| MA: | Okay. |
| LH: | I don't think she should get the money directly. She's not – *(Shakes Head)* |
| MA: | Are you sure she - because I don't want her to sign something and next thing you know she doesn't sell me the house. |
| LH: | No, no. That's not gonna happen. Don't bring it up to her. Yesterday, she and I were on the phone. She said - I told her the closing is tomorrow. She said okay, yeah I just want to get rid of these houses, you know? |
| MA: | Yes. |
| LH: | I don't want them in my name. |
| MA: | Mhm. |
| LH: | The government can take whatever they want. I don't want them to bother me. |
| MA: | Mhm. |
| LH: | I'm afraid. I'm an attorney – |
| MA: | I don't blame you. |
| LH: | You know what I'm saying? |
| MA: | I agree with you one hundred percent.  Right. |
| LH: | I don't want her to say something – |

MA:        Right.

LH:        The wrong thing on the phone one day and it's being recorded and then I'm screwed.

MA:        Ah, I understand what you're saying.

LH:        I'd rather – I'd rather –

MA:        She – she must know she's getting the money though right?

LH:        She doesn't know. I think she forgot.

MA:        Well, the thing is that puts me in a bad position because she's signing over her house. And what if she forgets that she signed over her house?

LH:        She's not going to forget.

MA:        If she's not gonna forget that, she's gotta remember the premium, doesn't make sense, right?

LH:        I know but I mean, the best thing I can do is maybe give it to her daughters, but if she gets it directly, I'm afraid -

MA:        Well, It's going to her some way though –

LH:        Yeah.

MA        I just want to make sure, Okay, So alright, so alright

LH:        I'm afraid she's going to say something one day.

MA:        You're afraid she's gonna say something to…? [UI].

LH:        Anyone.

MA:        Yeah, and then I'm dead.

LH:        You?

MA:        Right, right I understand what you are saying we both are -

LH:        I'm an attorney.  [UI]

MA:        I understand what you're saying.

| | |
|---|---|
| LH: | I'm fucked.  You know what I'm saying? |
| MA: | Yeah. |
| LH: | Her daughter's know we're here. They know we are doing a closing and everything like that - |
| MA: | They know they're getting with this and that - |
| LH: | Yeah. |
| MA: | And they know that we're doing in cash so the government doesn't know - |
| LH: | Yes, yes. |
| MA: | So nobody is [UI]. |
| LH: | I'm afraid about her. *(points pen at subject)* |
| MA: | When I talked to her she was seemed perfectly fine. |
| LH: | I know – her memory. She'll - |
| MA: | You don't have to act with me, you don't [UI] I am in the same position you are so. |
| LH: | No, Yeah I know, this whole morning I was like I don't even know if I should do this. |
| MA: | Right, okay so if you don't want to do it just - |
| LH: | No, no, I do but… |
| MA: | Okay. |
| LH: | That money part - *(Waving her hand)* |
| MA: | Mhm. |
| LH: | We have to be careful because I don't want her saying something to someone and it was recorded.  I'm scared. |
| MA: | You're afraid that she is just gonna repeat it. |
| LH: | Exactly. |

MA:         She knows about it, you're afraid that she's just gonna repeat it to the wrong person.

LH:         Yeah, yeah.

MA:         So what do I do with the money, I have this whole pile of money as a matter of fact just sitting there.

LH:         Um, I mean, you can put it in an envelope and give it to me.

MA:         Yeah, I'll give it to you

LH:         [UI]

MA:         No, no I put it, I put it, it's in a, I brought it in like ah.

LH:         Mhm.

MA:         Whatever, I have a cooler.  Put it in the cooler.

LH:         Yeah, I'll count it later.

MA:         Okay.

LH:         I can't do that in front of her, I don't wanna take that risk.  It's not worth it for me.

MA:         To count it in front of her?

LH:         I'm just gonna, I'm just gonna have to trust you.

MA:         You know how much it is, right?

LH:         [UI].

MA:         33,100 right? Cause it.

LH:         Yeah, 8,100 is for me.

MA:         And then, 25 is for her.

LH:         For family.

MA:         [UI] okay. Okay.

LH:         So if you could just put it in an envelope, seal the envelope with something or maybe put it in two separate envelopes -

MA:         But, she already knows about it, it's too late.  She already told us, that she knows about it.

LH:         Here's the thing based on the conversations I've had with her.

MA:         She could tell somebody by accident, you mean?

LH:         Yes *(nods her head)*

MA:         Really?

LH:         It's not a risk that we should take.   The money should just go straight to her daughter.

MA:         You're sure she wants to go through with this and she knows, she knows what she is doing?

LH:         She knows, I'm one hundred percent -

MA:         She knows she's getting the money, she knows what she's doing, you just don't want her to slip.  Okay, alright, alright.  Let me get you coffee

ARGUMENT

POINT ONE

HILLS' OBJECTIONS TO HER
GUIDELINES CALCULATIONS LACK MERIT

HILLS objects to the Guidelines calculations set forth in the PSR; specifically, the

two level enhancement pursuant to § 2J1.2(b)(3)(C) for extensive planning or preparation, and

the two level enhancement pursuant to § 3E1.1 for use of a special skill, by acting as an attorney.

Although she went to trial, HILLS also seeks a two-level reduction for acceptance of

responsibility, pursuant to § 3E1.1, arguing that it is merited because she did not raise an

entrapment defense, did not testify, did not deny the essential charges against her, withdrew her

post-trial motions, and now accepts full responsibility for her criminal conduct.   HILLS'

Guidelines are correctly calculated in the PSR.  The government opposes the defendant's

objections to her Guidelines.

The Enhancement for Extensive Planning and
Preparation Was Correctly Imposed

        "There is no commentary from the Sentencing Commission and a dearth of

caselaw interpreting the operative term in § 2J1.2(b)(3)(C)."  United States v. Petruk, 836 F.3d

974, 977 (8th Cir. 2016).  The Court in Petruk, however, provided some guidance, and imposed

the two level enhancement under § 2J1.2(b)(3)(C) stating that it was warranted because there

was extensive planning and preparation like the "gathering together of lies and

misrepresentations," Id. (quoting United States v. Rodriguez, 499 Fed. Appx. 904, 909 (11th Cir.

2012)).

31

Similarly here, there were multiple material misrepresentations to justify the imposition of this two level enhancement.  For example, HILLS sent a letter to the government fraudulently seeking to induce the government to lift its lien and falsely claiming that Esimai would not receive any financial benefit from the sale of her real property.  The extensive planning also included preparations for four separate sales of Esimai's properties.  Esimai, HILLS and Ashley met on March 8, 2016 and discussed and planned for multiple possibilities by which HILLS and Esimai could conceal from the government the cash proceeds.  The possibilities included an offshore account in Nigeria; hiding the cash in the accounts of Esimai's children; making the money transfers look like rent payments; and placing the cash in a safe to avoid the creation of any bank records documenting large cash transfers.  In addition, at the real estate closing, HILLS, Esimai and Ashley executed documents and Ashley paid $33,100 in cash to HILLS.  Accordingly, the planning was extensive and the Court should reject the defendant's argument.

The Enhancement for the Use of a
Specialized Skill Was Properly Assessed

HILLS argues that the two level enhancement under § 3B1.1, use of a specialized skill, should not be applied because she exercised no legal skill to commit this crime.  This objection also lacks merit.  As an attorney, HILLS "abused a position of public or private trust or a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  This enhancement is available even when the offense is inchoate so long as the court "determines with reasonable certainty that the defendant actually intended to use his or her special skill or positon of trust" to facilitate or conceal the offense.  United States v. Downing, 297 F.3d 52, 65 (2d Cir. 2002).  The Commentary to § 3B1.3 references lawyers as an example of an individual possessed with a specialized skill.  § 3B1.3 comment (n.4).

32

Here, HILLS used her law firm letterhead in her fraudulent letter to the government to facilitate her scheme, by requesting the removal of lien. Indeed, it is only because she was an attorney who could represent Esimai that she could perpetrate the fraud.  Her law license was just another tool for her to use in the planning and execution of the scheme.  The two level enhancement for use of a specialized skill should be applied.

A Two- Level Reduction For
Acceptance of  Responsibility Is Inappropriate

HILLS argues that she should be awarded a two-level reduction in her Guidelines offense level for acceptance of responsibility even though she went to trial.  HILLS contends that she presents that rare situation where she has demonstrated post-conviction acceptance of responsibility and remorse such that the two-level reduction for acceptance of responsibility is appropriate.  The government disagrees and a two-level reduction is inappropriate.

The commentary to § 3E1.1(a) states that:

> This adjustment is not intended to apply to a defendant who puts the government
> to its burden of proof at trial by denying the essential factual elements of guilt,
> is convicted, and only then admits guilt and expresses remorse.  Conviction by
> trial, however, does not automatically preclude a defendant from consideration
> for such a reduction.  In rare situations a defendant may clearly demonstrate
> an acceptance of responsibility for his criminal conduct even though
> he exercises his constitutional right to a trial.

U.S.S.G. § 3E1.1, comment (n.2); United States v. Taylor, 475 F.3d 65, 69 (2nd Cir. 2007) (holding that this adjustment is not intended to apply to a defendant who puts the government to its burden of proof by denying the essential factual elements of guilt).  In support of her argument, HILLS claims that she withdrew her post-trial motions and accepted full responsibility for her actions.  She further claims that although she put the government to its burden at trial, she deserves acceptance points because she did not testify and did not assert an entrapment defense during the trial, did not deny the essential facts underlying the charges against her, did not deny

33

that she made misrepresentations to the government, and did not deny that she knew Esimai could not benefit financially from the sale of her properties.  According to HILLS, "the crux of . . . [her] defense at trial was that . . . the government was not actively engaged in any enforcement action . . ." (Def. Mem. at 40).

The trial record belies the defendant's argument.  In his opening, closing and during the cross-examination of the government's cooperator, HILLS' attorney challenged HILLS' factual guilt and thereby extinguished the possibility of her being awarded acceptance points.  Specifically, an essential factual element of HILLS' guilt was that she attempted to obstruct the government's enforcement of a restitution Judgment and a forfeiture Order through a concealed cash real estate sale.  Any proceeds from the sale of Esimia's real properties was supposed to be recouped by the government.  In defense counsel's opening, closing and during cross-examination, counsel implied and directly claimed that the proceeds from the sale of one of Esimai's properties was going to be given to the government and not secretly retained by Esimai and HILLS.[3]  This assertion was untrue.  In fact, the government proved at trial that the proceeds

---

[3]  For example, in his opening, defense counsel denied an essential factual element of guilt by arguing this falsehood:

> She tried to walk away from this. She changed her mind.  You're going to hear that on tape at the end where she says during the meeting on Aril 6th: We just want to give the money to the government. Does that sound like somebody who was trying to commit a scam?
>
> As far as the $8,000 broker's fee, well, she was a licensed real estate broker and a licensed attorney and she's entitled to a broker's fee for bringing the parties together to but or sell a piece of property. So the broker's fee is a smokescreen that the government would throw at you to have you believe that she is corrupt because she's going to put money in her pocket but, in fact, she was legally entitled to that money assuming the sale would go through.

from the real property sale was to be given to Esimai and HILLS in a secret undisclosed cash transaction concealed from the government. This fact was an essential factual allegation that was challenged by HILLS' attorney.

During cross-examination of the government's cooperator, Michael Ashley, defense counsel attacked Ashley and claimed that HILLS was not concealing the real estate transaction from the government, but instead intended to give the real estate sale proceeds to the government. (Tr. at 233).

Finally, in his summation, contrary to the weight of the evidence against the defendant, defense counsel renewed his argument that HILLS wanted the real estate sale proceeds to go to the government. (Tr. 390-91).

Accordingly, the trial record evidences that this is not the rare situation where the defendant went to trial and should still be allowed a reduction in her Guidelines for acceptance of responsibility.

---

The rest of the money in that bag was going to go back to the government. She was going to put it in her escrow account and give it to the government because the government was the one who was going to get it

(Tr. at 138-39).

35

POINT TWO

HILLS' MOTION FOR A DOWNWARD DEPARTURE
SHOULD BE DENIED IN ALL RESPECTS

HILLS argues for a downward departure, pursuant to § 5K2.20, because her criminal conduct constituted aberrant behavior.  The Second Circuit has adopted a "totality of circumstances" approach to what constitutes aberrant behavior warranting a downward departure.   Among the factors that a sentencing court should consider are significant planning.  An aberrant behavior departure is generally not available where the defendant engaged in "[r]epetitious or significant planned behavior." USSG § 5K2.20, comment. (n.2).  See Zecevic v. United States Parole Commission, 163 F.3d 731, 735-36 (2d Cir. 1998).

As set forth above, HILLS engaged in significant planned criminal conduct.  Her offense was not the result of spontaneous behavior.  In their March 8, 2016 meeting, HILLS, Esimai and Ashley discussed the ways in which HILLS and Esimai could conceal the cash proceeds from the government.  HILLS was calculating and deliberate.  She weighed the risks and tried to find ways to avoid her criminal conduct being uncovered.

Moreover, HILLS was not a naïve layperson, but an attorney who surely knew that lying to the government in a letter to the U.S. Attorney's Office was significant.  She planned and intended to deceive the government to obstruct its efforts to execute on the Court's restitution Judgment and its forfeiture Order.  She did not hesitate to betray her oath as an attorney.

HILLS was not motivated to perform good works for Esimai.  Her principal motivation was clearly money.  Her significant financial planning in this scheme was reflected by the fact that HILLS insisted that she be paid her fee at a real estate broker's rate and not at the lesser rate typically received by attorneys.  It meant more money for her.

## POINT THREE

### THE FACTORS SET FORTH IN 18 U.S.C. § 3553
### WARRANT A GUIDELINES SENTENCE

Title 18, United States Code, Section 3553 outlines the procedures for imposing sentence in a criminal case.  The "starting point and the initial benchmark" in evaluating a criminal sentence is the Guidelines sentencing range.  Gall v. United States, 552 U.S. 38, 49 (2007).  If and when a district court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The court must also "state[ ] with specificity" its reasons for so departing or varying "in a statement of reasons form."  Id.

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)."  United States v. Davis, 2010 WL 1221709 (E.D.N.Y. March 29, 2010).  Section 3553 provides several factors for the Court to consider in determining what sentence to impose on a criminal defendant.

The Nature and Circumstances of the Offense
and the History and Characteristics of the Defendant

The first Section 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Here, HILLS engaged in a calculated scheme to obstruct the government's enforcement of a $4.9 million dollar restitution Judgment and a $13.5 million dollar forfeiture Order entered as a money judgment against her relative and co-conspirator, Faith Esimai.  HILLS and Esimai sought to sell Esimai's real estate holdings for cash and conceal the

37

transactions from the government, which had placed liens on Esimai's properties to preclude the sale of the properties unless all of the sale proceeds went towards satisfaction of the Judgment and Forfeiture Order.

The evidence against HILLS was overwhelming.  The proof included damaging recordings obtained by Ashley in which HILLS acknowledged that she knew what she doing was wrong and admitted that, if caught, she would lose her law license.   HILLS sent a fraudulent letter to the government requesting that it lift its lien on Esimai's real property falsely and claiming that none of the sale proceeds would be disbursed to Esimai.  HILLS participated in this scheme for the money.  Indeed, at one point, she insisted that she wanted to be the broker for the real estate sales, and not the attorney, because the broker fees would be more substantial.  At the April 6, 2016 closing, HILLS made sure that she, not Esimai, left the closing with the $33,100 in cash from the closing proceeds.

HILLS claims that she comes from a troubled childhood, followed by a troubled marriage.  This assertion may very well be true.  Nevertheless, HILLS is also well-educated and an attorney.  In any event, she was able to overcome her purported troubled past and obtain a law degree.  HILLS could have avoided this criminal conduct and rejected the temptation of easy money.  Instead, she went for the money.

<u>The Need for the Sentence Imposed</u>

The second Section 3553 factor requires the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant

with educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Court's sentence should reflect the seriousness of the offense and serve to punish the defendant.  HILLS sought to obstruct the government's efforts to recover through a restitution Judgment and a forfeiture Order the losses sustained by the victims of a multi-million dollar mortgage fraud scheme.  HILLS's efforts to thwart the government's efforts to collect demonstrated a disrespect for the law that, as an attorney, she took an oath to uphold.  In addition, a term of incarceration is warranted to deter others that the unlawful disregard for and intentional efforts to obstruct the judgments and orders of our courts carry serious consequences.

<u>The Kinds of Sentences Available and the Sentencing Range Established</u>

The third and fourth Section 3553 factors require the Court to consider the kinds of sentences available and the kinds of sentence and the sentencing range established for the defendant's offenses.   As noted in paragraph 84 of the PSR, HILLS is ineligible for probation. U.S.S.G. § 5B1.1, comment. n.2.   HILLS' Guidelines range of imprisonment is 27 to 33 months. PSR at ¶78.  The sentence imposed should take into consideration HILLS' family circumstances and the fact that she is expecting another child.  If incarceration is imposed, a possible alternative would be to delay execution of her sentence for a period of time until after the birth of her child. HILLS appears to have supportive family members, who could assist in caring for the child while she serves her prison term.  18 U.S. C. §§ 3553(a)(3) and 3553(a)(4)(A).

Finally, HILLS argues that even if she does not merit a departure from a Guidelines sentence on the grounds of aberrant behavior, she should be given a non-Guidelines sentence of probation based upon factors not set forth in the Guidelines.  <u>See</u> <u>United States v. Jones</u>, 460 F.3d 191, 194 (2d Cir. 2006).   Under <u>Jones</u>, the sentencing Court can consider

factors not set forth in the Guidelines.  The Court need only consider the Guidelines range and policy statements, but that does not mean mandatory adherence.  The sentencing Court retains discretion in the sentence to be imposed and the sentence must only stay within the bounds reasonableness and what is a fair and just sentence under all the circumstances.  Id.

Here, the defendant's conduct was particularly egregious and calls for a Guidelines sentence because she was an attorney, who acknowledged that she knew she was breaking the law and did so anyway.  Therefore, even under Jones, the defendant should still be sentenced within the Guidelines.

<u>CONCLUSION</u>

The defendant's sentencing motion should be denied.  The Court should impose a sentence within the Guidelines range of imprisonment set forth in the PSR.

Dated: Brooklyn, New York
October 25, 2019

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

By:    <u>/s/ Martin E. Coffey</u>
Martin E. Coffey
Assistant U.S. Attorney
(718) 254-6157

To:    Bruce Barket, Esq.
Danielle Muscatello, Esq.
Attorneys for Hills

Patricia A. Sullivan
U.S. Probation Officer

41